## COMMONWEALTH *vs.* CARL H. DREW.

Suffolk. September 5, 2006. - November 9, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Practice, Criminal,* New trial, Assistance of counsel. *Constitutional Law,* Assistance of counsel.

Statement of the standard of review applying to a criminal defendant's claims of error apparent on the trial record, and those based on evidence adduced at a hearing on a motion for a new trial. [638-639]

This court considered on appeal the merits of a criminal defendant's motion for a new trial where the defendant's conviction was not "firmly settled." [639-640]

A criminal defendant failed to demonstrate that his trial counsel lacked training [640-641] or that counsel rendered ineffective assistance with respect to his investigation and preparation of the case [641-643]; his cross-examination of one of the Commonwealth's forensic experts [643-644]; his failure to seek immunization for an allegedly exculpatory witness or to seek admission of the witness's testimony as an exception to the hearsay rule [644-647]; or his over-all performance at trial [647-650].

INDICTMENT found and returned in the Superior Court Department on May 9, 1980.

Following review by this court, 397 Mass. 65 (1986), a fourth motion for a new trial, filed on September 16, 2003, was heard by *John P. Connor, Jr.,* J.

A request for leave to appeal was allowed by *Cordy,* J., in the Supreme Judicial Court for the county of Suffolk.

*Michael D. Cutler* for the defendant.

*Steven E. Gagne*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree in 1981. Before his direct appeal was heard, trial counsel filed a motion for a new trial raising issues that later were raised in his direct appeal. That motion was denied by the trial judge. Also before his direct appeal was heard, counsel assigned to represent the defendant on his direct appeal (not trial counsel)

filed a second motion for a new trial based on an alleged recantation of testimony by a material witness. That motion was denied by a different judge. The denials of the defendant's first and second motions for a new trial were appealed and heard with his direct appeal. The conviction and the denial of the two motions for a new trial were affirmed on appeal. *Commonwealth* v. *Drew*, 397 Mass. 65 (1986).

On January 6, 1992, the defendant, acting pro se, filed his third motion for a new trial, in which he alleged for the first time that he was denied effective assistance of both trial and appellate counsel. The motion was denied by a third judge. On April 30, 1992, the defendant timely filed a petition for leave to appeal the denial of his third motion for a new trial, pursuant to the gatekeeper provision of G. L. c. 278, § 33E. A series of assignments of counsel to assist the defendant on appeal failed to produce any representation, and his petition for leave to appeal was dismissed on December 15, 1994, for want of prosecution.

On September 16, 2003, represented by present counsel, the defendant filed his fourth motion for a new trial. He alleged recantations by three material witnesses, newly discovered exculpatory evidence, ineffective assistance of trial counsel, and cumulative error. After an evidentiary hearing, a fourth judge (not the trial judge, who is deceased) in the Superior Court denied the motion. The judge found the three recantation witnesses, as well as a fourth witness who allegedly provided the newly discovered exculpatory evidence, not credible. He also determined that the defendant's claims of ineffective assistance of counsel, which, he observed, fell into three categories, failed because (1) they were dependent on the testimony of one or more of the four witnesses who he found were not credible; (2) they involved matters apparent from the trial transcript and necessarily were subsumed in the court's plenary review under G. L. c. 278, § 33E, in the course of the defendant's direct appeal; or (3) they involved matters of pretrial preparation that had not been shown to produce a substantial risk of a miscarriage of justice. The defendant timely filed a petition pursuant to G. L. c. 278, § 33E, seeking leave to appeal the denial of his fourth motion for a new trial. A single justice granted the defendant limited leave to appeal the denial of his ineffective

assistance of counsel claims, excepting those claims based on the testimony of the four witnesses whose testimony the motion judge found not credible. The defendant's petition was denied in all other respects. We now affirm the denial of the defendant's fourth motion for a new trial.

1. *Background.* We recite the following facts from the court's opinion in *Commonwealth* v. *Drew, supra* at 67-68. Further details are reserved for discussion of the issues. The defendant, a pimp, was convicted of the February 8, 1980, murder of a prostitute. The Commonwealth adduced evidence that the victim had tried to sever her relationship with the defendant after she witnessed him take the life of another prostitute during a satanic ritual. The defendant and the victim argued frequently, and on several occasions he threatened to kill her. On the evening of February 8, 1980, the victim, Carol Fletcher, Robin Murphy (who also witnessed the defendant's ritual killing of the prostitute), Carl Davis, and the defendant drove to Family Beach in Westport. When they arrived, the defendant directed Murphy to take the victim out of the car. Murphy dragged the victim by the throat and hair into the woods. Murphy and the defendant then stoned the victim, and Murphy slit the victim's throat at the defendant's direction. The defendant tore the victim's head from her dead body.

Some months later, in the presence of Murphy, Davis, and another woman, the defendant described for Lea Johnson how he killed "a girl . . . because she wanted to leave the cult." A portion of the victim's skull, jewelry, clothing, bloodstained rocks, and a clump of hair were found near the Family Beach area of Westport on April 13, 1980.

Murphy was indicted for her participation in the victim's murder and pleaded guilty to murder in the second degree. In exchange for testifying truthfully she also was granted immunity from prosecution for any involvement she had in the death of the other prostitute.

The defendant testified that he spent the evening of February 8, 1980, in two bars on Bedford Street. His alibi was corroborated by a prostitute who worked for him. She testified that she was never out of his presence for more than fifteen or twenty minutes. On cross-examination she admitted that

although she could not be certain it was Friday, February 8, she was with him every Friday evening at that time.

2. *Standard of review.* We must first determine the standard of review to apply to the claims of ineffective assistance of counsel that are apparent on the trial record, and those based on evidence adduced at the hearing on the motion for a new trial.

The motion judge declined to consider claims that were based on the trial record because they were subsumed in the scope of plenary review under G. L. c. 278, § 33E. Relief that could have been, but was not, granted during plenary review is not absolutely precluded after § 33E review. For example, in *Commonwealth* v. *Scott*, 428 Mass. 362, 369 (1998), in its plenary review under G. L. c. 278, § 33E, the court, sua sponte, vacated a conviction for a predicate felony that was duplicative of a felony-murder conviction. By contrast, in *Commonwealth* v. *Ambers*, 397 Mass. 705, 710 (1986), the court granted relief from a consecutive sentence on a conviction for a predicate felony that was duplicative of a defendant's felony-murder conviction on an appeal allowed by a single justice under § 33E. In that case, the relief could have been granted during plenary review but was not.

Although a decision of the single justice under G. L. c. 278, § 33E, to grant leave to appeal the denial of a motion for a new trial is final and unreviewable, the allowance of the defendant's petition for leave to appeal "does not . . . excuse the defendant from the procedural consequences of waiver." *Commonwealth* v. *Randolph*, 438 Mass. 290, 293 n.7 (2002). Errors alleged in such motions that are grounded in the record that was before the court in its plenary review under § 33E, while not strictly precluded from further consideration in such an appeal, will be reviewed under the less favorable standard of a substantial risk of a miscarriage of justice. *Id.* at 297. We recognize, however, that "the defendant's conviction in a capital case has undergone the exacting scrutiny of plenary review under § 33E." *Id.*

With respect to the other claims of ineffective assistance of counsel allowed by the single justice, they are claims that could have been raised in the defendant's second motion for a new

trial, and were not.[1,2] As such, the claims are deemed waived, but reviewable under the substantial risk of a miscarriage of justice standard. See *Commonwealth* v. *Randolph, supra* at 293-294.

We address one final issue on the subject of review before proceeding to the merits of the defendant's claims. The Commonwealth contends that this case falls in that category of cases where we have declined to consider on appeal the merits of a motion for a new trial because the defendant's conviction is "firmly settled." *Commonwealth* v. *Randolph, supra* at 296 n.11, citing *Commonwealth* v. *Valliere*, 437 Mass. 366 (2002) (no consideration of merits of defendant's sixth postdirect appeal motion where matter could have been raised in prior postdirect appeal motion). *Mains* v. *Commonwealth*, 433 Mass. 30 (2000) (no consideration on merits on appeal from denial of defendant's fifth motion for new trial). *Commonwealth* v. *Burnett*, 428 Mass. 469, 475 (1998), discussing *Hankerson* v. *North Carolina*, 432 U.S. 233, 244 n.8 (1977) ("States could 'insulate past convictions by enforcing the normal and valid rule that failure to object to a jury instruction is a waiver of any claim of error' "). See *Rodwell* v. *Commonwealth*, 432 Mass. 1016, 1018 (2000). The Commonwealth points to the passage of twenty-five years, a direct appeal, and four motions for a new trial decided by four separate judges in the Superior Court since the defendant was convicted, in support of its claim that the defendant's claim is "firmly settled."

What distinguishes this case from those that were "firmly settled" is that the defendant's pro se third motion for a new trial, which raised claims of ineffective assistance of trial and appellate counsel, was filed in 1992, only six years after his direct appeal was decided. It was denied, but his gatekeeper petition was then dismissed for reasons beyond the defendant's

---

[1]We disregard the first motion for a new trial because it was filed by his trial counsel. Cf. *Commonwealth* v. *Lanoue*, 409 Mass. 1, 3-4 (1990) (unrealistic to expect trial counsel who also was appellate counsel to call into question his own competence), *S.C.*, 409 Mass. 1 (1990).

[2]Claims of ineffective assistance of counsel raised after plenary review under G. L. c. 278, § 33E, are not reviewed under § 33E, but under the applicable constitutional standard. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 n.1 (1992).

control. The issues raised in that motion, similar to some of the issues raised in this appeal, were never fully adjudicated, and the circumstances that aborted his quest for an appeal cannot fairly be allowed to weigh against the defendant. Indeed, because of these circumstances the single justice treated the fourth motion for a new trial as a "continuation" of the appeal from the denial of his third motion.

We now turn to the defendant's claims of ineffective assistance of counsel, which we consider under the substantial risk of a miscarriage of justice standard.

3. *Ineffective assistance of counsel.* (a) *Defender training.* The defendant contends that his trial counsel was "woefully inexperienced and unskilled in the fundamentals of trial practice," as demonstrated by the trial judge's "constant criticisms" of him. He describes trial counsel at the time of his appointment to represent the defendant as "a young attorney with little if any prior jury experience and no prior murder trial experience, who, after the defendant's case[,] never appeared in another criminal case for the rest of his legal career."

The record reveals only that trial counsel was assigned to represent the defendant on May 9, 1980, by a judge in the Superior Court, and that at the time of his appointment he had been a member of the bar since November, 1959. By the time he testified at the hearing on the fourth motion for a new trial on November 3, 2004, trial counsel had retired from the practice of law, and had been a member of bars of the Supreme Judicial Court, the Federal District Courts of Massachusetts and Rhode Island, and the Court of Appeals for the First Circuit.

There is no merit to the suggestion that the trial judge's criticism of counsel amounted to a finding of ineffective assistance. The judge interjected himself into examinations of witnesses by both counsel, gratuitously and often without objection from opposing counsel. Similar but far more egregious conduct by the same judge resulted in a new trial in *Commonwealth* v. *Sylvester*, 388 Mass. 749 (1983). On December 20, 1983, this court ordered this defendant's second motion for a new trial heard by a judge other than the trial judge.

The defendant cites the Committee for Public Counsel Services (CPCS) standards for appointment to represent defendants in

murder cases (June, 1999), and he asserts that "[t]he problem of incompetent uncertified appointed murder defenders, for convictions prior to the adoption of performance and prior experience standards, challenges the justice of nearly every case before 1999 where the available exculpatory evidence was ignored or misused by the defense."

The 1999 standards promulgated by CPCS pursuant to G. L. c. 211D, §§ 4 and 9, have no application to appointments made in 1980. Counsel's performance must be measured against that of an "ordinary fallible lawyer," see *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), at the time of the alleged professional negligence, and not with the advantage of hindsight. See *Commonwealth* v. *Adams,* 374 Mass. 722, 729-730 (1978). Moreover, the negligence required for a showing of ineffective assistance of counsel, see *Commonwealth* v. *Rondeau,* 378 Mass. 408, 412 (1979), is not established by a violation of CPCS standards. Rather, a violation may, if the standard was intended to protect someone in the defendant's position, be admissible as some evidence of attorney negligence. Cf. *Fishman* v. *Brooks,* 396 Mass. 643, 649 (1986) (violation of disciplinary rule intended to protect one in plaintiff's position is merely evidence of attorney negligence).

(b) *Defender preparation.* (1) *Alibi investigation.* There is no merit to the defendant's claim that counsel failed to prepare alibi witnesses adequately or meaningfully, or to interview potential alibi witnesses in a timely fashion. The defendant himself testified at trial as to his alibi, which was confirmed by one of his prostitutes. It is not likely that the second defense investigator's attempt to identify potential alibi witnesses at two bars more than one year after the killing was impaired by the passage of time. The motion judge found that the claimed failure of memory by the potential witnesses, whose names appeared on a list provided by counsel to his investigator in July, 1980, was not credible, and that their asserted failure of memory was more likely due to an unwillingness to cooperate. The judge found that the potential alibi witnesses could not have been unaware of the significance of February 8, 1980, because the police were interviewing people at the bars within twenty-four hours of the victim's disappearance, including the defendant

and key witnesses. In addition, the defendant and Murphy were arrested for the murder within two months of February 8, and one witness testified at trial that there was significant publicity in the press and on television, and that "everybody talked about it." The defendant himself testified at trial that "[t]here was talk all over the bars where I was at." We also note that the publicity was so pervasive that the trial venue was changed from Bristol to Worcester County on motion of the defendant. The judge's conclusion that the claimed failure of witnesses' memory was not due to the passage of time, but more likely to an unwillingness to cooperate, is supported by the record.

(2) *Lack of familiarity with discovery.* The defendant cites as ineffective assistance one instance during the trial where counsel was unable to locate a particular report that the judge found in counsel's file. The defendant's present counsel described the volume of documents in this case as "virtually overwhelming." There were more than 2,000 pages of discovery, and the defendant fails to show how trial counsel's difficulty in this single instance either was conduct that fell measurably below that of an "ordinary fallible lawyer," or "likely deprived the defendant of an otherwise available, substantial ground of defense," where he otherwise demonstrated command of the case. *Commonwealth* v. *Saferian, supra* at 96. See *Commonwealth* v. *Randolph*, 438 Mass. 290, 297-298 (2002) (under substantial risk test, we must ask [1] if there was error; [2] if error was prejudicial; [3] if, in context of entire trial, error materially influenced verdict; and [4] whether conduct in question was reasonable tactical decision).

The defendant also faults trial counsel for failing to hire his first investigator until June, 1980, failing to respond to the loss of his first investigator until one month before trial, and failing to speak with his second investigator until the seventh day of trial. Although counsel did not hire an investigator immediately, that does not constitute ineffective assistance of counsel. It was not unreasonable to spend approximately six weeks evaluating the case by reviewing the more than 2,000 pages of discovery and interviewing some witnesses before hiring an investigator and giving him direction to assist the defense.

The record is silent as to what communication may or may

not have taken place between counsel and the first investigator during the first six months of his investigation. The record discloses only that the first investigator became ill several months after he was hired (June, 1980) and that he was hospitalized a short time before trial. Counsel hired a second investigator, who appears to have begun his investigation on February 14, 1981, and concluded his work on March 3, 1981. He prepared a report that appears to be in three parts. The first part covers his work through February 18, 1981; the second part covers his work from February 23 to 27, 1981; and the third part covers his work from March 2 to 3, 1981. The record is silent as to what communications may have taken place between counsel and the second investigator, except that the investigator's report indicates they met on February 23, 1981, after he had conducted approximately fifteen interviews, and he was then instructed to do further work. There has been no showing that counsel's conduct in this respect fell measurably below that of an ordinary fallible lawyer, or even how the defendant was prejudiced.

(3) *Interviewing defense witnesses.* The defendant contends that trial counsel was ineffective for failing to interview certain defense witnesses before calling them to testify. The record discloses that two witnesses refused to speak to the second investigator "or anyone else." This does not rise to the level of ineffective assistance. "Witnesses may decline of their own will to talk to either side or to both . . . ." *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 658 (1979).

The defendant also has failed to show how he was harmed by counsel's alleged failure to prepare the prostitute who testified in support of his alibi. The defendant, who has the burden of showing harm, has lost the volume of the transcript containing her testimony, and we are unable to review this claim. In any event, this court specifically focused on this witness's testimony in its opinion, see *Commonwealth* v. *Drew*, 397 Mass. 65, 68 (1986), and we presume that any irregularities appearing on the face of the transcript, as the defendant claims, would have caught the court's attention during plenary review.

(c) *Forensic testimony.* The defendant contends that counsel's brief cross-examination of one of the Commonwealth's forensic experts, in which he failed to elicit any contradictions regarding

expected versus reported mutilations, and his failure to hire a competing expert to assist him or to give testimony, constituted ineffective assistance because his efforts produced only a repetition of grisly details of the killing. The testimony of this expert is contained in the volume of the transcript that has been lost, and we are unable to review the point.

Nevertheless, the cause of the victim's death and the identification of her skull fragment were not seriously contested, and there is no evidence how another expert could have helped the defense. See *Commonwealth* v. *Horton*, 434 Mass. 823, 834 (2001). Counsel elicited evidence from other Commonwealth experts that no blood or hairs collected at the crime scene could put the defendant there, a point he drove home in his closing. He also argued forcefully that the Commonwealth's expert testimony went no further than establishing that the victim had died. The alleged failure to discredit an expert whose testimony does not appear to have been important does not amount to ineffective assistance of counsel. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001) (failure to impeach witness on minor point not ineffective assistance). In addition, based on the record before us, the decision not to engage an expert on the subject of mutilation, an uncontested minor point, was not ineffective assistance of counsel.

(d) *Sparda's testimony.* Maureen Sparda, who the defendant asserts would have offered crucial exculpatory testimony at trial, unexpectedly invoked her privilege against self-incrimination. The defendant argues that counsel was ineffective for failing to seek to immunize her or, alternatively, to seek to admit, under available exceptions to the hearsay rule, the statement she gave to the defense investigator.

It is not enough to show that counsel failed to seek immunity for Sparda; he must show that the request for immunity likely would have succeeded. Cf. *Commonwealth* v. *Comita*, 441 Mass. 86, 92 (2004) (claim of ineffective assistance based on failure to file motion to suppress depends on showing likelihood motion would have succeeded). Although this court has discussed what the defendant refers to as "judicial immunity," it did not do so until two years after the defendant's conviction was affirmed, see *Commonwealth* v. *Curtis*, 388 Mass. 637, 644

(1983). Moreover, it has done so only to the extent that, absent statutory authority, it would not "preclud[e] the possibility that in some unique circumstances . . . due process may require the granting by a judge of a limited form of immunity." *Id.* at 646. Even if a witness's assertion of her rights under the Fifth Amendment to the United States Constitution hinders a defendant's ability to present his most effective defense, this does not create a general doctrine of judicial immunity for defense witnesses. The right to present witness testimony is not absolute. *Id.* Judicial immunity is not available if the prospective witness is an actual or potential target of prosecution. See *Commonwealth* v. *Upton*, 390 Mass. 562, 577 (1983). Nor is it available "if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or . . . relate[s] only to the credibility of the government's witnesses." *Commonwealth* v. *Doherty*, 394 Mass. 341, 345 (1985), quoting *Government of the V.I.* v. *Smith*, 615 F.2d 964, 972-973 (3d Cir. 1980).

Sparda's proffered testimony falls into two categories. First, admissions by Murphy and Fletcher that they colluded in falsely accusing the defendant; and second, evidence of Murphy's motive to kill the victim based on a love triangle among Murphy, the victim, and Sparda. Sparda was not entitled to immunity because her proffered testimony concerning false allegations amounted to prior inconsistent statements by Murphy and Fletcher that went only to their credibility. The portion of Sparda's proffered testimony about the love triangle also was not clearly exculpatory because it included inculpatory statements that the defendant participated in the killing by snapping the victim's neck, and it was merely cumulative of other evidence.

Counsel was able to establish evidence of the love triangle without Sparda's testimony. He elicited testimony from Murphy that she had been a lover of both Sparda and the victim during the same time period — late fall, 1979, to early 1980. He also was able to establish through his cross-examination of Fletcher that Murphy had a motive to kill the victim. Within two days of February 8, 1980, Murphy expressed anger that the victim was planning to move to Florida with one Richard Thomas, and she told Fletcher that the victim "wouldn't be around much longer." Counsel argued the point in his closing.

In addition, counsel was able to impeach the credibility of Murphy in many instances through the use of letters she had written in which she accused Fletcher of lying about the defendant's involvement in the murder. He also was able to show that Murphy had a motive to frame the defendant, which we discuss later, without Sparda's testimony. The defendant has failed to show that the presence of unique circumstances deprived him of due process which only could have been remedied by immunizing Sparda.

There is no merit to the claim that Sparda's statements to the second investigator were admissible as an independent exception to the hearsay rule. The defendant's reliance on *Commonwealth v. Odware*, 429 Mass. 231, 238 (1999), is misplaced. In that case a State police officer testified on cross-examination by defense counsel that an eyewitness who asserted his right not to testify at trial made a pretrial identification of a photograph of someone other than the defendant as the shooter. On redirect examination, the prosecutor attempted to elicit testimony from the officer that the same person identified the defendant's photograph from a different array. The officer was permitted to testify that the nontestifying witness identified a second person from a different array, but he was not permitted to testify that the eyewitness had identified the defendant. The testimony was not offered as substantive identification testimony, cf. *Commonwealth v. Warren*, 403 Mass. 137, 141 (1988) (defendant's due process rights not violated as long as identifying witness is present in court, is available to be cross-examined, and acknowledges extrajudicial identification), but as a prior inconsistent identification to the identification elicited by the defendant on cross-examination. That is, it was not offered for the truth of the matter asserted, but for impeachment purposes.

Similarly, Sparda's proffered statement to the second investigator that the defendant was not involved in the killing would not have been admissible as a statement against penal interest. The defendant failed to show how Sparda's statement would have subjected her to criminal liability such "that a reasonable [person] in [her] position would not have made the statement unless [she] believed it to be true." *Commonwealth v.*

*Drew*, 397 Mass. 65, 73 (1986), quoting *United States* v. *Thomas*, 571 F.2d 285, 288 (5th Cir. 1978). In addition, the statement was not "corroborated by circumstances clearly indicating its trustworthiness." *Id.*

(e) *Over-all defense.* The defendant contends that counsel's over-all performance, with his alleged lack of interrogation objectives, omission of powerful exculpatory evidence, lack of preparation, and disorganized opening statement and closing argument, left the defendant with an essentially defenseless case. We disagree.

Counsel demonstrated both familiarity with the voluminous discovery in the case and the significance of the various components. In particular, the transcript shows that he was familiar with the numerous statements that Murphy and Fletcher had given, and that he used them appropriately to impeach both witnesses. In one instance, Murphy said she could not recall ever making a statement that the victim's body had been doused with gasoline and burned after she had died. Later, counsel dramatically concluded the defendant's case by reading to the jury, with the consent of the prosecutor, a portion of a statement Murphy made to the police in which she said Carl Davis retrieved a can of gasoline from the back seat of his car, poured it on the body, and burned it.

He also elicited and highlighted inconsistencies between the testimony and statements of Murphy and Fletcher, and thereby created an effective cross impeachment. For example, Murphy testified that the defendant gave her a knife and told her to slit the victim's throat. Fletcher testified that Murphy used the knife she usually carried, taking it from her pants. Counsel also elicited contradictions between them about whether their car had become stuck in traffic while the victim was being transported.

Counsel made appropriate objections to testimony. He attempted to create a thorough record by offering the grounds for his objections, including his objection to the Commonwealth's late notice of its intent to offer evidence of the victim's presence at the prior ritual killing and her resulting intention to disassociate herself from the defendant as evidence of the defendant's motive for killing her. When the judge refused to

allow counsel time to state his reasons on the record, he insisted on obtaining leave to file a written statement of his reasons. At first the judge agreed to this procedure, but later changed his mind because such a document would either become lost or "clog the record."

In addition, counsel made a thorough record of the judge's refusal to allow a defense witness to testify regarding a statement of Carl Davis, an unavailable coventurer. Counsel made an offer of proof as to what the witness would say, and he stated his reasons for offering the testimony, which included a recitation of his memorandum of law on the matter. At one point in the trial, the judge complimented counsel by acknowledging that "nobody has worked harder and nobody wants to do better by his client."

Counsel unsuccessfully objected to evidence of the fact of the prior ritual killing. However, he persisted and successfully objected to the prosecutor's attempt to exploit the grisly details of the prior ritual killing on the ground that they were overly prejudicial. Counsel also successfully objected to unduly prejudicial testimony that the defendant was raised on a farm and slaughtered animals. He was successful in numerous hearsay objections to the prosecutor's questions. Counsel demonstrated a command of the discovery material, the law of evidence, and an awareness of both the need and the proper means to preserve questions for appellate review.

Contrary to the defendant's claim that counsel had no organized defense or trial strategy, the record indicates otherwise. In his opening statement counsel focused on Robin Murphy, the Commonwealth's key witness, as unreliable, having pleaded guilty to murder in the second degree of the victim, and having been granted or promised immunity in two other murders. He also alerted the jury to the defendant's alibi.

The theme of Murphy's unreliability was repeated and developed throughout the trial, including the fact that the Commonwealth paid for many of her expenses beginning in the spring of 1980; that she received substantial promises and rewards in exchange for her testimony; and that she made no mention that the victim attended the ritual killing of a prostitute, the defendant's alleged motive, until fourteen months after the

defendant was indicted. Counsel elicited inconsistencies between Murphy's prior statements to police and others, and that some of her inconsistencies were purposeful and controlled. He suggested that Murphy alone killed the victim, that she had a motive to kill the victim, and that Murphy had announced before the victim's death that the victim "would not be around for long."

Counsel elicited testimony that Murphy had a motive to frame the defendant. The defendant had slapped Murphy for stealing his girl friend's photograph identification. Murphy said to the defendant in response, "Every dog has his day," and that his day would come. He elicited testimony from Murphy that she disliked the defendant very much for hitting her. He obtained testimony on cross-examination from Carol Fletcher that Murphy said she hated the defendant for hitting her. And one defense witness testified that Murphy said she would "frame [the defendant] for slapping her in the face."

The cross-examination of Murphy proceeded according to a plan. When the judge expressed impatience over counsel's protracted cross-examination of Murphy, he explained that he wanted to keep her on the witness stand a long time (longer than was his practice) because the longer she testified, the more she "invent[ed] things." The judge accepted his explanations, and permitted him to cross-examine Murphy at length. Another strategy was to avoid the gory details of the murder that had been elicited on direct examination.

The closing argument given by counsel was a coalescence of themes and points he developed at trial. Counsel highlighted the importance of Murphy's testimony to the prosecution, her deals with the Commonwealth, her motive to frame the defendant, the changes in her statements over time, her manipulative personality, her involvement in three murders, and the likelihood that Murphy alone killed the victim. He marshalled the facts in support of his argument that Murphy and other witnesses could not be believed. He also stressed that the Commonwealth had not produced any physical evidence that the defendant was present at the scene. The defense strategy generally was well conceived, well executed, and properly grounded in the evidence.

Finally, the defendant maintains that counsel failed to argue

virtually iron-clad exculpatory evidence consisting of the window of time within which the murder was committed. He contends that, as a matter of record, it would have been impossible for the participants to have driven to the murder scene, killed the victim and destroyed her body, then returned, all within eighty minutes, especially where there was evidence that the ritual killing lasted at least ninety minutes. The short answer to this claim is that the time line was never firmly established. In light of the other numerous inconsistencies concerning the sequence of events immediately leading up to the killing, the question of the time line merely was cumulative. The failure to offer cumulative evidence is not ineffective assistance of counsel. See *Commonwealth* v. *Freeman*, 442 Mass. 779, 791 (2004). Moreover, it would not have resulted in any failure of proof of the fact of the murder, and it would not have affected the defendant's alibi, which accounted for his presence for virtually the entire evening of February 8, 1980. Indeed, it would have been a reasonable strategy for counsel not to challenge the time line of the crime where the defendant's alibi, if believed, would have made it impossible for him to have been a participant. The impact of the time line is minor in comparison with other exculpatory evidence that counsel elicited, including evidence of a letter Murphy had written that was critical of Fletcher for falsely accusing the defendant (and Murphy) of participating in the victim's murder, and another letter in which Murphy stated she never accused the defendant of the murder because she believed he did not kill the victim. There is no merit to the other claims.

4. *Conclusion.* For the foregoing reasons, we conclude that there has been no showing of ineffective assistance of counsel. The order denying the defendant's fourth motion for a new trial is affirmed.

*So ordered.*